9 P.3d 892 (2000)
PUGET SOUNDKEEPER ALLIANCE, Washington Environmental Council, and People For Puget Sound, Respondents,
v.
STATE of Washington, DEPARTMENT OF ECOLOGY, and Tesoro Northwest Company, Petitioners.
No. 44762-9-I.
Court of Appeals of Washington, Division 1.
September 18, 2000.
*893 Patti Goldman, Jan E. Hasselman, Earthjustice Legal Defense Fund, Seattle, for Appellant.
Ronald L. Laviigne, Attorneys General's Office-Ecology Division, Olympia, Mathew Cohen, Heller Ehrman White & McAuliffe, Seattle, for Respondent.
AGID, C.J.
RCW 90.48.520 requires that wastewater discharge permits issued under the federal Clean Water Act (CWA) and Washington's Water Pollution Control Act (WPCA) include conditions requiring the permit holder to use all known, available, and reasonable methods to control toxicants in that wastewater. The Department of Ecology (DOE) issued a permit to Tesoro Northwest Company (Tesoro) that includes a combination of numeric effluent limits and narrative conditions to ensure that this requirement is met. Because the plant often operates well below the numeric discharge limits specified in the permit, Puget Soundkeeper Alliance (Soundkeeper) appealed the permit, arguing that the applicable statutes require numeric limits only, and that those limits should be lower, reflecting Tesoro's actual discharge performance. We hold that DOE properly imposed a combination of conditions, these conditions further the purposes of the CWA and WPCA more effectively than numeric conditions alone and, on this record, the numeric limits are reasonable.

FACTS
DOE renewed a waste discharge permit for the Shell Anacortes refinery in March 1998. After Tesoro acquired that refinery, the permit was transferred to Tesoro on September 15, 1998. The permit contains numerical effluent limitations, whole effluent toxicity limitations and narrative conditions. Soundkeeper appealed the Tesoro permit to the Pollution Control Hearings Board (PCHB), claiming that it violated state law standards, which require using all known available and reasonable methods of prevention, control, or treatment (AKART), because the historic operation of the facility produced actual discharge levels well below the levels set in the permit. Soundkeeper reasoned that the refinery's actual discharge levels were themselves known, available and reasonable methods of pollution control and therefore required DOE to impose levels lower than those set in the permit. It also argued that DOE violated applicable statutes by using a combination of numeric limits and narrative conditions because only numeric limits satisfy AKART requirements. The parties submitted the case to the PCHB on stipulated facts. They agreed that the refinery actually operates in compliance with AKART and that its reported discharge levels for most parameters were significantly below permit limits most of the time. Based on the stipulated facts, the PCHB upheld the permit, concluding that the combination of numeric discharge limits and the narrative requirements in the permit fully satisfied Washington AKART requirements.

DISCUSSION
Standard of Review
This court undertakes the same review of DOE and PCHB decisions as does *894 the superior court.[1] We review their legal decisions de novo, giving substantial weight to the agency's interpretation of the statutes it administers.[2] An agency's interpretation of a statute is not binding on the court,[3] but we will uphold it if it is a plausible construction.[4] In reviewing a decision of the PCHB, we may consider only the evidence that was before it.[5] Here, the PCHB was limited to stipulated facts in making its decision, so we are likewise limited in our review to those stipulations. Accordingly, we cannot consider Soundkeeper's argument based on Tesoro's actual performance standards because they are not among the stipulated facts and thus not part of our record. The record does include a stipulation that reported discharge levels for most parameters were significantly below permit levels most of the time, and we can consider that stipulation in deciding the other two issues: whether the Tesoro permit violates AKART requirements and whether the AKART provision allows DOE to use a combination of numeric and narrative conditions.
Statutory and Regulatory Background
The Federal Water Pollution Control Act (CWA) was enacted with the broad policy objective of restoring and maintaining the chemical, physical and biological diversity of the nation's waters.[6] One goal of the CWA was to eliminate the discharge of pollutants into the nation's navigable waters by 1985.[7] To this end, the CWA created the National Pollutant Discharge Elimination System (NPDES),[8] a permit program designed to press for development of new, more efficient and effective technologies and impose progressively more demanding limits as technology advanced.[9]
Washington state, through DOE, administers the NPDES discharge permit program,[10] but it must comply with the federal effluent limitations.[11] Those limits must be set at levels requiring the permit holder to use the best practicable pollution control technology currently available.[12] For certain classes of pollutants, effluent limits
shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator....[[13]]
The CWA does not prevent states from adopting or enforcing other limits, so long as they are as stringent as the federal standards.[14]
*895 Similarly, Washington's WPCA has a policy of maintaining the highest possible standards to insure the purity of all waters in the state and, to that end, requires using "all known available and reasonable [treatment] methods" to prevent and control the pollution of state waters.[15] The statute declares that Washington will work cooperatively with the federal government to extinguish sources of water quality degradation.[16] But the WPCA also requires that this policy be consistent with several other state policies, including those promoting industrial development.[17]
DOE is the Washington water pollution control agency for all purposes under the CWA.[18] Accordingly, DOE has complete authority to administer the NPDES permit program,[19] and has adopted procedures for that purpose.[20] Whenever possible, permits issued by DOE must ensure compliance with AKART requirements.[21]
CWA's Broad Policy Goals are Implemented by its Specific Regulatory Provisions
Soundkeeper's arguments rely heavily on the policies of the CWA and WPCA, asserting that they require DOE to limit water pollution to the greatest extent achievable and compel the development of new control technology. Soundkeeper is correct that the permit program was intended to impose increasingly stringent technologybased limits on effluents.[22] But the way the federal and state statutory schemes are designed, reductions in effluent limits are driven by advances in technology, not vice versa. Effluent limits are not reduced in order to drive advances in technology. Nor are they necessarily reduced with each new permit cycle. Rather, the statutory scheme envisions that effluent limitations will decrease as technology advances.[23] Nothing in our state's parallel statute indicates that it differs from the federal statutory scheme on this point.
Nor do either Acts' declarations of policy control over the more specific statutory provisions adopted to implement those general declarations:[24]
Undeniably, Congress' strong statement of its objective must color EPA's and our interpretation of specific provisions of the Act. But, as any student of the legislative process soon learns, it is one thing for Congress to announce a grand goal, and quite another for it to mandate full implementation of that goal. Read as a whole, the Clean Water Act shows not only Congress' determined effort to clean up our polluted lakes and rivers, but also its practical recognition of the economic, technological, and political limits on total elimination of all pollution from all sources. The Act contains numerous requirements that cost be taken into account in establishing effluent limits, as well as assorted exemptions from those limits. Moreover, the purposes section, in its own right, suggests that Congress recognized that the substantive provisions of the Act fall short of completely achieving the announced goals of the Act.[[25]]
Washington law is no different. Although declarations of policy in an act serve as an *896 important guide to the meaning of the operative sections, they have no operative force in and of themselves.[26] And, while Washington has declared a public policy of maintaining the highest possible standards to insure the purity of its waters, that policy is expressly subject to several other public policy considerations and to the specific requirements of the statute.
Thus, the goals of the CWA, progressively reducing discharge levels and ultimately preventing all discharge, are general long term goals. So too is Washington's goal of maintaining the highest standards to ensure the purity of the state's waters. But under the statutory provisions implementing these goals, even a permit that does not directly advance the Acts' policies is not arbitrary if it complies with specific NPDES and AKART requirements.
AKART Requirements Do Not Limit DOE to Numeric Effluent Conditions
Soundkeeper claims the Tesoro permit fails to comply with what it argues are Washington's more stringent AKART requirements because AKART mandates that permits contain only numeric effluent limits and this permit includes both numeric and narrative conditions. The AKART statute, RCW 90.48.520, provides:
Review of operations before issuance or renewal of wastewater discharge permitsIncorporation of permit conditions
In order to improve water quality by controlling toxicants in wastewater, the department of ecology shall in issuing and renewing state and federal wastewater discharge permits review the applicant's operations and incorporate permit conditions which require all known, available, and reasonable methods to control toxicants in the applicant's wastewater. Such conditions may include, but are not limited to: (1) Limits on the discharge of specific chemicals, and (2) limits on the overall toxicity of the effluent. The toxicity of the effluent shall be determined by techniques such as chronic or acute bioassays. Such conditions shall be required regardless of the quality of receiving water and regardless of the minimum water quality standards. In no event shall the discharge of toxicants be allowed that would violate any water quality standard, including toxicant standards, sediment criteria, and dilution zone criteria.
The phrase "all known, available, and reasonable methods" is not defined in the statute,[27] but it is defined in DOE regulations:[28]
"AKART" is an acronym for "all known, available, and reasonable methods of prevention, control, and treatment." AKART shall represent the most current methodology that can be reasonably required for preventing, controlling, or abating the pollutants associated with a discharge. The concept of AKART applies to both point and nonpoint sources of pollution.[[29]]
In Weyerhaeuser Co. v. Southwest Air Pollution Control Auth.,[30] the court considered the "all known available and reasonable" language in the context of air pollution emission requirements.[31] The Legislature used the phrase in conjunction with the requirement that notice be given of construction of new contaminant sources. "[T]he department of ecology ... may require ... the submission of plans ... in order to determine whether the proposed construction ... will be in accord with applicable rules ... and will provide all known available and reasonable methods of emission control."[32] The statutory language considered by the court in Weyerhaeuser is essentially identical to the language at issue here, and the air pollution control statute is highly analogous to the water pollution control act. Thus, the analysis *897 of the quoted language in Weyerhaeuser guides our interpretation of the AKART language in RCW 90.48.520.
The Weyerhaeuser court addressed, in the air pollution context, both issues Soundkeeper raises here. It held that while the statutory language was clearly meant to foster the use of new emission control technology, it did not necessarily require using the best control technology. The court identified two reasons for its holding. First, the "known" and "available" language does not require applicants to develop new technology to advance emission controls, and second, the term "reasonable" limits DOE to requiring a system that is both economically and technically feasible.[33] The court also held the "known, available and reasonable"[34] language did not require DOE to use only numeric limits. We hold that the AKART requirement in RCW 90.48.520 is to be similarly construed. It neither requires applicants to develop new technology nor limits DOE to numeric conditions on NPDES permits. Indeed, because the statute at issue here expressly states that permit "conditions may include, but are not limited to: (1) Limits on the discharge of specific chemicals, and (2) limits on the overall toxicity of the effluent,"[35] the conclusion that DOE is not limited to numeric conditions under the AKART provision is even stronger here.
Soundkeeper also argues that numeric limits facilitate discharge measurement and enforcement. While we agree that ease of measurement is a significant benefit of numeric limits, nothing in the act suggests it is required to implement the statutory goals.[36] As the Weyerhaeuser court held, the AKART language does not mandate numeric limits, and the plain language of the WPCA makes clear that permit conditions are not limited to numeric limits.
Finally, the AKART language in RCW 90.48.520 neither defines nor specifies how to determine what "all known, available, and reasonable methods" are. We will uphold an agency's plausible construction of a statute if the statute is ambiguous and is within the agency's specialized area of expertise.[37] DOE's interpretation in this case was reasonable, and Soundkeeper has not persuaded us that it conflicts with the statute.
Tesoro Permit Does Not Violate AKART and Was Properly Issued
Soundkeeper's second argument is that, at a minimum, Washington's AKART provision requires that the permit's discharge limits not allow discharges at higher levels than the actual historical performance of the facility. Because the numeric limits in the Tesoro permit are higher than the refinery's historic performance levels and the narrative conditions cannot make up for this discrepancy, Soundkeeper contends the Tesoro permit violates the statute.
But the AKART provision requires using reasonable methods to control toxicants. The Tesoro permit's conditions, which directly address the refinery's pollution control methods, may in fact better satisfy AKART than numeric limits alone because the limits only indirectly relate to the methods used to control the end productpollution. This permit's combination of numeric and narrative conditions satisfies AKART standards, especially where, as the parties agreed, the plant is already using the best available technological methods to control effluent discharge.
It is somewhat ironic that Soundkeeper opposes the narrative permit conditions because they answer many of its concerns that we not lose sight of the policies and goals of pollution control. The narrative conditions *898 require Tesoro to properly operate and maintain its treatment system and to implement measures to reduce pollution, even though it meets the numeric limits. The refinery must update and follow a plan to maintain high treatment system efficiency and study the efficiency of the treatment system. Tesoro must also develop a plan to identify and implement pollution prevention that is technically and economically achievable, including identifying and studying at least ten projects to reduce discharge. Those that are feasible will be adopted as AKART and scheduled for implementation. This condition contributes to satisfying AKART requirements and does so in a way that advances the goal of greater reductions in discharge levels. Not only do these requirements complement numeric limits, they impose a higher level of performance on Tesoro than could be achieved by numeric limits alone. In addition, these substantive operational requirements can be enforced separately from numeric limits even if Tesoro's discharge levels remain below the numeric limits. This, in turn, contributes to developing new technology to achieve the pollution control Acts' lofty goals.
As the PCHB stated, "the Tesoro permit not only requires the permittee to diligently operate and maintain its existing wastewater treatment system, the historic performance of which satisfied AKART, but also to discover and implement opportunities to further reduce pollution through source control." The Tesoro permit implements AKART requirements and does not violate either the CWA or WPCA.
The Pollution Control Hearings Board and the superior court are affirmed.
GROSSE, and BAKER, JJ., concur.
NOTES
[1] Manke Lumber Co. v. Diehl, 91 Wash.App. 793, 801-02, 959 P.2d 1173 (1998), review denied, 137 Wash.2d 1018, 984 P.2d 1033 (1999).
[2] Manke Lumber, 91 Wash.App. at 802, 959 P.2d 1173 (citing Weyerhaeuser Co. v. Department of Ecology, 86 Wash.2d 310, 315, 545 P.2d 5 (1976)); McTavish v. City of Bellevue, 89 Wash. App. 561, 564, 949 P.2d 837 (1998); City of Redmond v. Central Puget Sound Growth Management Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998).
[3] Redmond, 136 Wash.2d at 46, 959 P.2d 1091.
[4] Seatoma Convalescent Ctr. v. DSHS, 82 Wash. App. 495, 518, 919 P.2d 602 (1996), review denied, 130 Wash.2d 1023, 930 P.2d 1230 (1997). The standard of review is essentially the same under federal law. See Natural Resources Defense Council, In;, v. U.S. E.P.A., 822 F.2d 104, 122 (D.C.Cir.1987) (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).
[5] Dioxin/Organochlorine Ctr. Center v. Department of Ecology, 119 Wash.2d 761, 771, 837 P.2d 1007 (1992).
[6] 33 U.S.C. § 1251(a).
[7] 33 U.S.C. § 1251(a)(1).
[8] 33 U.S.C. § 1342.
[9] Natural Resources Defense Council, Inc. v. U.S. E.P.A., 655 F.2d 318, 328, cert. denied sub nom. General Motors Corp. v. Gorsuch, 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (D.C.Cir.1981).
[10] 33 U.S.C. § 1342(b).
[11] 33 U.S.C. § 1342(b)(1)(A) (incorporating by reference 33 U.S.C. § 1311).
[12] 33 U.S.C. § 1311(b)(1)(A)(i).
[13] 33 U.S.C. § 1311(b)(2)(A)(i).
[14] 33 U.S.C. § 1370. See also Power Authority v. Department of Environmental Conservation, 379 F.Supp. 243 (N.D.N.Y.1974) (holding states retain the right to set more restrictive standards with respect to discharges from hydroelectric power plants).
[15] RCW 90.48.010.
[16] RCW 90.48.010.
[17] RCW 90.48.010.
[18] RCW 90.48.260.
[19] RCW 90.48.260(1).
[20] Chapter 173-220 WAC.
[21] RCW 90.48.520; WAC 173-220-130(1)(a).
[22] Rybachek v. U.S. E.P.A., 904 F.2d 1276, 1283 (9th Cir.1990); Stream Pollution Control Bd. v. U.S. Steel Corp., 512 F.2d 1036, 1043 (7th Cir. 1975).
[23] Texas Oil & Gas Ass'n v. U.S. E.P.A., 161 F.3d 923, 927 (5th Cir. 1998) (citing E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977)); Natural Resources, 822 F.2d at 124.
[24] Wellons v. Northwest Airlines, Inc., 165 F.3d 493 (6th Cir. 1999) (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)).
[25] National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 178 (D.C.Cir.1982) (citations omitted).
[26] Hearst Corp. v. Hoppe, 90 Wash.2d 123, 128, 580 P.2d 246 (1978). See also Lund v. Department of Ecology, 93 Wash.App. 329, 337, 969 P.2d 1072 (1998).
[27] RCW 90.48.520.
[28] WAC 173-220-130(1)(a).
[29] WAC 173-201A-020.
[30] 91 Wash.2d 77, 81, 586 P.2d 1163 (1978).
[31] Former RCW 70.94.152(1) (1973-91).
[32] Former RCW 70.94.152(1) (1973-91).
[33] Weyerhaeuser, 91 Wash.2d at 81-82, 586 P.2d 1163. DOE also administers and issues permits under the air pollution control statutes.
[34] Weyerhaeuser, 91 Wash.2d at 83, 586 P.2d 1163.
[35] RCW 90.48.520 (emphasis added).
[36] Cf. Bird-Johnson Corp. v. Dana Corp., 119 Wash.2d 423, 426, 833 P.2d 375 (1992) (holding that Model Toxic Controls Act did not create an express right of contribution because it could have included language providing for contribution, but did not include such language).
[37] Manke Lumber, 91 Wash.App. at 802, 959 P.2d 1173; Seatoma Convalescent, 82 Wash.App. at 518, 919 P.2d 602.