# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, | No.  54810-1-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, | |
| Respondent. | |

WORSWICK, J. — Northwest Environmental Advocates (NWEA) appeals the superior court's order affirming the Department of Ecology's denial of NWEA's rulemaking petition for stricter wastewater treatment plant discharge regulations in Puget Sound and its tributaries. NWEA argues that Ecology's denial was outside the agency's authority and was arbitrary and capricious because (1) Ecology failed to comply with state law mandating minimum technology standards for wastewater treatment facilities by denying the rulemaking petition; (2) Ecology violated the Administrative Procedures Act (APA) by failing to respond to the issues NWEA raised in its petition; and (3) Ecology's denial of the petition was arbitrary and capricious. We disagree and hold that Ecology's determination was within its statutory authority and was not arbitrary and capricious. Accordingly, we affirm.

FACTS

I. HISTORICAL BACKGROUND

A.    *Puget Sound Pollution and Wastewater Treatment Plants*

The Puget Sound has pollution problems. Among the sources of pollution in Washington's inland salt waters is the addition of nutrients from various sources. The addition of excess nutrients—especially nitrogen and phosphorous—to Puget Sound is causing the levels of dissolved oxygen in the water to drop to levels that may be harmful to fish and other aquatic life. This nutrient load may also contribute to algae growth which further harms water quality and produces toxins that can be harmful to humans and animals. The nutrient load in Puget Sound comes from a variety of sources, including the Pacific Ocean, rivers in Canada and Washington that empty into the sea, and municipal wastewater treatment plants in Canada and Washington.

Additionally, human-generated toxins have been released into Puget Sound, including polychlorinated biphenyls (PCBs), polybrominated diphenyl ethers (PBDEs), polycyclic aromatic hydrocarbons (PAHs), copper, lead, and zinc. These toxins can accumulate in wildlife, harming wildlife and having adverse effects on the people who eat it. The same is true of other introduced toxins such as pharmaceuticals and personal care products that are introduced into the Puget Sound through wastewater treatment plants.

There are more than 100 wastewater treatment plants around Puget Sound. Each treatment plant varies in size and the amount of effluent it discharges into Puget Sound, largely based on the size of the municipality the plant serves.

Wastewater treatment plants generally use a system of biologically treating sewage known as "secondary treatment." This process was first developed at the turn of the Twentieth Century, and was improved and widely implemented in the United States by the 1970s. However, a 2008 report by the federal Environmental Protection Agency (EPA) states that although nearly all wastewater treatment plants provide secondary treatment, conventional processes "do not remove the phosphorus and nitrogen to any substantial extent." Supplemental Administrative Record (Suppl. Admin. R.) at 3990. In recent years, technology has developed to treat sewage further to remove nitrogen and phosphorus by filtration and chemical treatment. This enhanced filtration and treatment is known as "tertiary treatment." A 2010 report published jointly by Ecology and the EPA stated that tertiary treatment could reduce the amount of pharmaceuticals and other toxins that pass out of the treatment plants and into Puget Sound.

Ecology commissioned a 2011 report that studied potential upgrades to wastewater treatment plants (Tetra Tech report). The Tetra Tech report evaluated six different tertiary treatment technologies, which it referred to as Objectives A-F. The most stringent of these, Objective F, analyzed limiting nitrogen to less than 3 mg/L of effluent and phosphorus to less than 0.1 mg/L using processes that included tertiary treatment.

The Tetra Tech report evaluated projected costs for implementing each objective but cautioned that "[t]he accuracy of the estimated costs and rate impacts is in the range of -50 percent to +100 percent." Suppl. Admin. R. at 1451. For Objective F, the report concluded that implementation would cause fee increases of between $11.46 and $94.66 in 2010 dollars. Tetra Tech also estimated the total costs for implementing tertiary treatment based on capital costs and operation and maintenance (O&M) costs in each of Washington's 62 Water Resource Inventory

Areas (WRIAs). The Puget Sound area WRIAs account for WRIAs 1-19. WAC 173-500-040, -990.[1] Tetra Tech's estimate for capital and O&M costs for tertiary treatment under Objective F totaled $4.48 billion in 2010 dollars. Extrapolating this over the -50 percent to +100 percent accuracy range results in projected implementation costs of Objective F tertiary treatment falling between $2.24 billion and $8.96 billion in 2010 dollars.

The Tetra Tech report stated it evaluated "a range of established technologies that are available and economically reasonable and have been applied in Washington and elsewhere in the United States." Suppl. Admin. R. at 1467. However, the Tetra Tech report went on to say it provided "preliminary analyses" that was an "early step in a public process to determine levels of nutrient removal that could be required in Washington. Significant additional work is needed before any such nutrient limits can be adopted." Suppl. Admin. R. at 1447. The report also identified costs from externalities and other potential impacts of tertiary treatment.

For example, the Tetra Tech report concluded that nitrogen removal to a level consistent with Objective F would produce up to 5 percent more effluent sludge. It also concluded that energy consumption for tertiary treatment "would require approximately two to three times the amount of electrical energy currently used by municipal wastewater treatment facilities." Suppl. Admin. R. at 1912.

Tetra Tech also provided guidelines for its cost projections. The report stated that its cost projections "are likely to vary significantly from real costs of upgrading a particular treatment plant facility, depending on the facility's specific conditions." Suppl. Admin. R. at 1483.

---

[1] WAC 173-500-040 states the region for each WRIA. WAC 173-500-990 provides a map showing the location of each WRIA.

The report recommended:

> Cost budgets for implementing nutrient removal at any specific facility should be based on a site-specific engineering report so that concerns, needs and constraints specific to the site, community and facility can be thoroughly addressed. Site-specific factors such as wastewater characteristics, site constraints, geotechnical conditions, and the condition and layout of the existing facility can have a dramatic impact on the ultimate cost of a treatment plant upgrade project.

Suppl. Admin. R. at 1483.

B.      *Regulatory Framework*

The federal Clean Water Act (CWA) provides that wastewater treatment plants must treat effluent to meet secondary treatment standards. 33 U.S.C. § 1311(b)(1)(B). EPA defined secondary treatment as limiting biological oxygen demand not to exceed a 30-day average of 30 mg/L and a 7-day average of 45 mg/L; total suspended solids not to exceed a 30-day average of 30 mg/L and a 7-day average of 45 mg/L; and pH (acidity) between 6 and 9. 40 C.F.R § 133.102. The CWA requires that wastewater treatment plants receive a permit before discharging effluent into state's waters. 33 U.S.C § 1311(a), 1342(a). EPA's regulations allow states to manage this permitting process and enforce CWA compliance. 40 C.F.R. §§ 122.41-43. The permits must include both technology-based effluent limitations and water quality-based limitations. 40 C.F.R. § 122.44.

To implement these standards, our Legislature mandated that Ecology create and manage a permitting scheme. RCW 90.48.260, 90.48.520. Ecology must issue permits to wastewater treatment plants in accordance with the CWA, but it may issue permits with more stringent requirements than those in federal regulations. 33 U.S.C. § 1370; 40 C.F.R. § 122.44(d). Our statutes require that when issuing a permit, Ecology must ensure that "all known, available, and

reasonable methods of treatment"—or AKART—are implemented by treatment plants.[2] RCW 90.52.040, 90.54.020.

In 1987, Ecology adopted WAC 173-221-040, which mandates discharge standards for wastewater treatment plants. WAC 173-221-040, Wash. St. Reg. 87-23-020 (Dec. 2, 1987). Ecology's regulation adopted discharge limits identical to those in EPA's regulation that defined secondary treatment. WAC 173-221-040. The regulation also limits fecal coliform discharges. WAC 173-221-040(2). Ecology also stated in regulation that as a policy all wastewater discharges must conform to AKART.

## II. NWEA's Petition

In November 2018, NWEA petitioned Ecology to revise Chapter 173-221 WAC. NWEA requested that Ecology redefine AKART to mean tertiary treatment of wastewater effluent, as described above, for municipal sewage treatment plants discharging into Puget Sound and its tributaries. NWEA asked that Ecology establish "an effluent quality for nitrogen of not more than 3 mg/L and an effluent quality for phosphorus of not more than 0.1 mg/L," a standard identical to Objective F from the Tetra Tech report. Clerk's Papers (CP) at 105-06 (citing Suppl. Admin. R. at 1449). NWEA also argued for mandated tertiary treatment because of its potential to remove other toxins from wastewater. NWEA also requested that the rule establish a presumption that tertiary treatment is "reasonable" under AKART and that municipalities would have to rebut that assumption to implement tertiary treatment and establish alternative

---

[2] "'AKART' is an acronym for 'all known, available, and reasonable methods of prevention, control, and treatment.'" WAC 173-201A-020.

technology-based standards. As part of its petition, NWEA submitted exhibits totaling more than 25,000 pages.

Ecology denied NWEA's petition in a January 2019 letter. Ecology stated that it did not agree that defining AKART as tertiary treatment in Chapter 173-221 WAC was reasonable. Ecology explained that "[t]reatment technology must be both economically and technically feasible in order to be AKART." CP at 119. Ecology stated it was undertaking a study with the EPA to determine a water quality-based approach to reducing effluent limits "because enhanced treatment for nutrient removal is neither affordable nor necessary for all wastewater treatment plants." CP at 119.

Ecology listed the alternative measures it was taking to apply AKART to its individual treatment plant permitting process:

> 1. Set nutrient loading limits at current levels from all permitted dischargers in Puget Sound and its key tributaries to prevent increases in loading that would continue to contribute to Puget Sound's impaired status.
> 2. Require permittees to initiate planning efforts to evaluate different effluent nutrient reduction targets.
> 3. For treatment plants that already use a nutrient removal process, require reissued discharge permits to reflect the treatment efficiency of the existing plant by implementing numeric effluent limits used as design parameters in facility specific engineering reports.

CP at 119. Ecology stated it decided on this approach because the complex relationships between discharger-specific nutrient limits and their impact locally and further afield required further study.

NWEA filed a petition for review in superior court in February 2019, arguing that Ecology's decision to deny the petition was arbitrary and capricious and exceeded Ecology's authority. Ecology responded in March, and filed the agency record in June. The agency record

included more than 30 documents spanning more than 1500 pages relevant to NWEA's petition.

NWEA filed a motion for admission of additional evidence to include all the exhibits NWEA

submitted with its petition. Ecology did not oppose the motion and the superior court granted the

motion in November.[3]

The superior court held a hearing on NWEA's petition for review in January 2020. The

court affirmed Ecology's denial of NWEA's rulemaking petition. NWEA timely appealed.

ANALYSIS

NWEA argues that when Ecology denied NWEA's petition for rulemaking, Ecology

violated its statutory duty to implement AKART to control the discharge of nutrients and toxins

from wastewater treatment plants. NWEA also argues that Ecology failed to comply with the

APA, and that its decision was contrary to the law and arbitrary and capricious. Ecology argues

that it properly applies the AKART standard in its wastewater discharge permitting processes

and determined that NWEA's proposed regulation was not economically reasonable. Although

we agree that Ecology is required to apply the AKART standard to wastewater treatment

facilities' discharges, we defer to Ecology's determination that NWEA's proposal was not

economically reasonable.

I. STANDARD OF REVIEW

The APA provides that an agency's decision to deny a rulemaking petition is subject to

judicial review as "other agency action." RCW 34.05.570(4); *Rios v. Dep't of Lab. & Indus.*,

---

[3] NWEA submitted additional information to the superior court under RCW 34.05.562(1): "The court may receive evidence in addition to that contained in the agency record for judicial review, only if it relates to the validity of the agency action at the time it was taken and is needed to decide disputed issues."

145 Wn.2d 483, 491-92, 39 P.3d 961 (2002). We may grant relief for a party aggrieved by an agency's discretionary action only if that action is: "(i) Unconstitutional; (ii) Outside the statutory authority of the agency or the authority conferred by a provision of law; (iii) Arbitrary or capricious; or (iv) Taken by persons who were not properly constituted as agency officials lawfully entitled to take such action." RCW 34.05.570(4)(c). The party challenging an agency's action has the burden of showing the invalidity of the action. RCW 34.05.570(1)(a).

We review Ecology's decisions from the same position as the superior court. *Squaxin Island Tribe v. Dep't of Ecology*, 177 Wn. App. 734, 740, 312 P.3d 766 (2013). We defer to the specialized knowledge and expertise of an administrative agency. *Squaxin Island Tribe*, 177 Wn. App. at 742. However, we do not extend that deference to agency actions that are arbitrary, capricious, and contrary to law. *Skokomish Indian Tribe v. Fitzsimmons*, 97 Wn. App. 84, 93, 982 P.2d 1179 (1999).

Our Supreme Court explained:

Ordinarily, an agency is accorded wide discretion in deciding to forgo rulemaking in an area, and fiscal constraints may reasonably determine whether an agency takes action (and, if so, how). But an agency's allusion to fiscal considerations and prioritizing cannot be regarded as an unbeatable trump in the agency's hand; on review, a plaintiff has the opportunity to show that the agency's failure to act was '[a]rbitrary or capricious.'

*Rios*, 145 Wn.2d at 507 (quoting RCW 34.05.570(4)(c)(iii)). The *Rios* court also explained that ordering an agency to undertake a rulemaking was an "extraordinary circumstance." 145 Wn.2d at 507.

Accordingly, we avoid exercising discretion that the Legislature entrusted to the agency. *Squaxin Island Tribe*, 177 Wn. App. at 742. We therefore review the record on appeal to "determine whether the agency reached its decision 'through a process of reason, not whether the

9

result was itself reasonable in the judgment of the court.'" *Squaxin Island Tribe*, 177 Wn. App. at 742 (quoting *Rios*, 145 Wn.2d at 501).

## II. ANALYSIS OF ECOLOGY'S DETERMINATION

A.      *Wastewater Discharge Statutes and Regulations*

Multiple statutes and regulations mandate Ecology and other state agencies apply AKART to keep state waters clean. The Legislature stated that it was our state's public policy to use AKART "to prevent and control the pollution of the waters of the state of Washington." RCW 90.48.010. In the Water Resources Act of 1971, the Legislature used substantially the same language to state that AKART should be the standard for treatment prior to entry of wastes into state waters "[r]egardless of the quality of the waters of the state." RCW 90.54.020(3)(b).

Similarly, the Pollution Disclosure Act of 1971 mandates that Ecology require waste be treated by AKART methods:

> [I]n the administration of the provisions of chapter 90.48 RCW, the director of the
> department of ecology shall, regardless of the quality of the water of the state to
> which wastes are discharged or proposed for discharge, and regardless of the
> minimum water quality standards established by the director for said waters,
> require wastes to be provided with all known, available, and reasonable methods
> of treatment prior to their discharge or entry into waters of the state.

RCW 90.52.040. Moreover, the Legislature mandates that "the department of ecology shall in issuing and renewing state and federal wastewater discharge permits . . . incorporate permit conditions which require all known, available, and reasonable methods to control toxicants in the applicant's wastewater." RCW 90.48.520.

Ecology's rules governing the permitting process for wastewater treatment facilities also mandate Ecology follow AKART when issuing permits. WAC 173-220-130(1) requires, in pertinent part that "[a]ny permit issued by [Ecology] shall apply and insure compliance with all

of the following, whenever applicable: (a) All known, available, and reasonable methods of treatment required under RCW 90.52.040, 90.54.020 (3)(b), and 90.48.520." Ecology also states that it is its policy that, "[r]egardless of the quality of the waters of the state, all wastes and other materials and substances proposed for discharge into said waters shall be provided with [AKART] prior to discharge." WAC 173-221-020.

As explained in the Facts section above, Ecology's domestic wastewater facility discharge standards are nearly identical to the federal CWA standards that EPA defines as "secondary treatment." *Compare* WAC 173-221-040 *and* 40 C.F.R § 133.102. Ecology's discharge standards go beyond the federal requirement and limit fecal coliform discharges. WAC 173-221-040(2). Ecology's wastewater and permitting regulations do not define secondary treatment other than to state, "This chapter also supplements 40 C.F.R. Part 133; Secondary Treatment Regulation. Wherever this chapter is more stringent than the federal regulation, the requirements of this chapter shall take precedence." WAC 173-221-010(2). The regulations are silent as to tertiary treatment.

B.      *Ecology's Compliance with AKART under RCW 90.48.520*

NWEA argues that by denying its petition for Ecology to define AKART as tertiary treatment, it is in violation of its statutory duties. Ecology argues that its governing statutes require that its permitting procedure comply with AKART, not that its regulations define AKART by a numeric limit. We agree with Ecology.

1. *State Law Mandates Wastewater Discharge Permits, and Not Ecology's Regulations, Comply with AKART.*

NWEA argues that because tertiary treatment is now available, Ecology's refusal to define AKART as tertiary treatment by regulation violates Ecology's duties under RCW 90.52.040, 90.54.020, 90.48.010, and 90.48.520. Ecology argues that the statutes mandate it apply AKART on a case-by-case basis when issuing wastewater discharge permits. We agree with Ecology.

We give effect to the plain meaning of statutes to determine legislative intent. *Ctr. for Envt. Law and Pol'y v. Dep't of Ecology*, 196 Wn.2d 17, 29, 468 P.3d 1064 (2020). We accord deference to an agency's interpretation of a statute only if (1) the agency is charged with the administration and enforcement of the statute, (2) the statute is ambiguous, and (3) the statute falls within the agency's expertise. *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 716, 153 P.3d 846 (2007). Even then, the agency's interpretation is not binding on us. *Ass'n of Wash. Bus. v. Wash. Dep't of Revenue*, 155 Wn.2d 430, 447 n.17, 120 P.3d 46 (2005). Policy declarations in statutes serve as an important guide to us, but they have no operative force. *Puget Soundkeeper All. v. Dep't of Ecology*, 102 Wn. App. 783, 790, 9 P.3d 892 (2000).

As an initial matter, RCW 90.48.010 and 90.54.020(3)(b) are policy declarations. By its plain language, RCW 90.48.010 begins, "It is declared to be the public policy of the state of Washington . . . ." Likewise, RCW 90.54.020 sets out that "[u]tilization and management of the waters of the state shall be guided by the following general declaration of fundamentals . . . ." It then states that state water quality shall not be violated except when "overriding considerations of the public interest will be served." RCW 90.54.020(3)(b). A "general declaration" of what is

in the "public interest" is a policy declaration. Thus, these statutes have no operative force. *Puget Soundkeeper*, 102 Wn. App. at 790.

Turning to RCW 90.52.040, it states that Ecology require waste be treated by AKART methods "prior to their discharge or entry into waters of the state," regardless of established water quality standards. The plain language of this statute means that Ecology must implement AKART driven by technology, regardless of whether the recipient waters are cleaner than regulations require. However, it does not direct Ecology to take any specific action regarding implementing regulations or issuing permits. Although the statute compels Ecology to comply with AKART, the statute does not clearly mandate that Ecology take the regulatory action NWEA requested. Indeed, chapter 90.52 RCW, the Pollution Disclosure Act of 1971, does not mandate that Ecology regulate discharge limits, treatment types, or other wastewater treatment plant operations. Rather, the operative portion of the act mandates only that commercial waste dischargers file annual reports on waste discharge amounts to Ecology. RCW 90.52.010. Thus, although RCW 90.52.040 places an AKART requirement on Ecology, it has nothing to do with effluent discharge limits, treatment types, or wastewater treatment plant permitting. Accordingly, although RCW 90.52.040 requires that Ecology implement AKART, the Legislature left the method by which AKART should be implemented up to Ecology.

This leaves RCW 90.48.520, which states that "the department of ecology shall in issuing and renewing state and federal wastewater discharge permits . . . incorporate permit conditions which require all known, available, and reasonable methods to control toxicants in the applicant's wastewater." This statute does require Ecology to take action that complies with AKART. However, by its plain language the statute is specific to "issuing and renewing state

and federal wastewater discharge permits." The statute does not require Ecology to promulgate any rule or regulation or set any limits on effluent discharges. Rather, the statute mandates that Ecology comply with AKART when issuing permits.

Division One's decision in *Puget Soundkeeper*, 102 Wn. App. 783, supports this conclusion. There, Ecology issued a discharge permit to a company. 102 Wn. App. at 785. Puget Soundkeeper appealed the permit to the Pollution Control Hearings Board (PCHB), arguing that the permit did not comply with AKART. *Puget Soundkeeper*, 102 Wn. App. at 786. PCHB upheld the permit, as did the superior court. *Puget Soundkeeper*, 102 Wn. App. at 786, 795. *Puget Soundkeeper* explains: "[T]he AKART language in RCW 90.48.520 neither defines nor specifies how to determine what 'all known, available, and reasonable methods' are." 102 Wn. App. at 793. Division One of this court affirmed, explaining the permit program is driven by advances in technology and confirmed that *permits issued* by Ecology must comply with AKART. *Puget Soundkeeper*, 102 Wn. App. at 789-90.

Here, Ecology interpreted RCW 90.48.520 to mandate that Ecology comply with AKART when issuing permits. And so it must. But like RCW 90.52.040, the statute neither specifies that Ecology implement regulations defining AKART to meet a particular standard, nor specifies how to determine what "all known, available, and reasonable methods" are. Ecology has interpreted RCW 90.48.520 to mandate that AKART be applied in each permit on a case-by-case basis. Indeed, NWEA admits in its opening brief that "Ecology must make an AKART determination each time it issues a permit to a discharger." Brief of Appellant (Br. of Appellant)

14

at 26. Thus, we conclude that the Legislature left the method by which to implement AKART up to Ecology.[4]

NWEA cites to *Massachusetts v. EPA*, 549 U.S. 497, 533, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007), to argue that Ecology's denial of the petition for rulemaking did not conform to its authorizing statute.[5] There, the U.S. Supreme Court held that EPA's denial of a rulemaking petition to regulate greenhouse gasses was unlawful because the EPA did not "comply with [a] clear statutory command" to regulate greenhouse gasses. *Massachusetts*, 549 U.S. at 533.

But *Massachusetts v. EPA* is distinguishable because of that very command. In *Massachusetts*, the Clean Air Act mandated that EPA "shall by regulation prescribe . . . standards applicable to the emission of any air pollutant." 549 U.S. at 506 (quoting 42 U.S.C. § 7521(a)(1)). No such command exists here in RCW 90.48.520. Here the Legislature directed Ecology to implement AKART when issuing permits; it did not specify that Ecology should prescribe AKART standards by regulation. Accordingly, NWEA's argument fails and we are not persuaded that Ecology is required to define AKART standards in a regulation.

---

[4] Because AKART is a technology-based requirement, it is constantly changing. Mandating that Ecology conduct a rulemaking here could lead to an absurd result where Ecology must conduct a rulemaking for every technological advancement. Such an outcome would place an unreasonable burden on the agency.

[5] The APA states: "The legislature also intends that the courts should interpret provisions of this chapter consistently with decisions of other courts interpreting similar provisions of other states, the federal government, and model acts." RCW 34.05.001.

2. *Ecology Determined that Defining AKART as Tertiary Treatment is not Economically Reasonable.*

NWEA argues that because secondary treatment is an older technology, it is no longer AKART, and that because tertiary treatment is AKART, Ecology is required to update its regulations. Ecology argues that it determined tertiary treatment is not economically reasonable and therefore not AKART in all circumstances. We defer to Ecology's expertise.

AKART standards are meant to foster the use of new treatment technology, but do not necessarily require using the best treatment technology available. *Puget Soundkeeper*, 102 Wn. App. at 792. The term "reasonable" in the AKART standard limits Ecology to requiring a treatment system that is both technically *and economically* feasible. *Puget Soundkeeper*, 102 Wn. App. at 793. The AKART standard under RCW 90.48.520 neither requires municipalities develop new technology nor limits Ecology to mandating numeric limits in permits. *Puget Soundkeeper*, 102 Wn. App. at 792-93. Municipalities and other entities applying for discharge permits must plan to implement treatment systems that are technically and economically achievable. *Puget Soundkeeper*, 102 Wn. App. at 794. Ecology adopts those that are feasible as AKART. *Puget Soundkeeper*, 102 Wn. App. at 794-95.

In *Squaxin Island Tribe*, the Tribe petitioned Ecology to engage in rule making regarding watershed flow rates. 177 Wn. App. at 736. Ecology denied the Tribe's petition, explaining that budget cuts limited the agency's ability to do comprehensive work on the matter and that additional information was needed before a comprehensive rulemaking could be undertaken. *Squaxin Island Tribe*, 177 Wn. App. at 739. The superior court ruled that Ecology's denial was arbitrary and capricious. *Squaxin Island Tribe*, 177 Wn. App. at 739. After examining the

evidence Ecology considered before issuing its denial, we reversed, explaining that Ecology reached its decision through a process of reason, and deferred to Ecology's wide discretion to choose and schedule rulemaking efforts. *Squaxin Island Tribe*, 177 Wn. App. at 743, 747-48.

Here, Ecology determined that defining AKART as tertiary treatment in chapter 173-221 WAC was not economically reasonable. As in *Squaxin Island Tribe*, Ecology also explained that it was undertaking further studies on water quality-based approaches and nutrient removal. The record before Ecology also showed that mandating tertiary treatment under Objective F in the Tetra Tech report as NWEA petitioned could cost up to $8.96 billion in 2010 dollars. It was within Ecology's agency expertise to decide that a projected multi-billion dollar cost was not reasonable to mandate for all Puget Sound area municipal wastewater treatment facilities. We do not determine for ourselves that Ecology's conclusion was reasonable, but we decide that Ecology concluded that a multi-billion dollar cost was economically unreasonable through a reasoned process.

NWEA's arguments to the contrary are inapt. NWEA argues that Ecology relies exclusively on WAC 173-221-040 when issuing permits and that Ecology has therefore adopted secondary treatment as AKART. EPA defined secondary treatment in 40 C.F.R § 133.102 and Ecology adopted those same discharge standards in WAC 173-221-040. NWEA reasons that because tertiary treatment has been determined to be AKART for select municipalities, Ecology should have adopted NWEA's petition to define AKART as tertiary treatment. NWEA's arguments fail for several reasons.

First, as explained in section 1 above, RCW 90.48.520 does not mandate that Ecology establish AKART standards through regulation, but rather mandates that Ecology issue permits

in compliance with AKART. Moreover, nothing in the controlling statutes or regulations equates secondary treatment with AKART. If secondary treatment no longer complies with AKART, then tertiary treatment—or whatever treatment currently complies with AKART—must be met through Ecology's permitting process.

Second, NWEA argues that PCHB has already determined that tertiary treatment is AKART for municipal sewage discharges in certain municipalities and that Ecology has not been complying with AKART when issuing permits to municipalities. To support this argument, NWEA cites PCHB's decision in *Sierra Club v. Department of Ecology*, where PCHB determined tertiary treatment was AKART for a wastewater treatment plant in Spokane. No. 11-184, 2013 WL 4490310 (Wash. Pollution Control Hr'gs Bd. July 19, 2013). NWEA also cites several municipalities' fact sheets for wastewater discharge permits that state the effluent performance standards in chapter 173-221 WAC constitute AKART.

But this case is not about whether Ecology complied with AKART when issuing permits, it is about whether Ecology is required to promulgate a regulation based on NWEA's proffered definition of AKART. As Ecology rightly argues, if NWEA believes Ecology has issued a discharge permit that does not comply with AKART, NWEA may first appeal the permit to the Pollution Control Hearings Board.[6]

---

[6] NWEA also argues that treatment "beyond secondary" has been implemented in municipalities around Puget Sound and that such treatments are therefore AKART. But as explained above, those are data points that speak to Ecology's AKART standards when issuing permits, not when promulgating regulations.

Next, NWEA argues that tertiary treatment is AKART because it was determined to be economically reasonable in the Tetra Tech report. But Ecology made a reasoned conclusion to the contrary.

NWEA relies on a statement in Ecology's Tetra Tech report that technologies to upgrade municipal wastewater treatment plants "are available and economically reasonable and have been applied in Washington and elsewhere in the United States." Suppl. Admin. R. at 1467; Br. of Appellant at 35. But NWEA's argument ignores other language in the Tetra Tech report that it was "preliminary analyses" and that "[s]ignificant additional work is needed before any such nutrient limits can be adopted." Suppl. Admin. R. at 1447. The Tetra Tech report went on to explain costs from externalities associated with tertiary treatment, such as increased energy consumption and effluent sludge production. Finally, the report recommended site-specific engineering and cost projections.

Thus, although the Tetra Tech report states that tertiary treatment technology is available, it does not reach a formal conclusion that tertiary treatment is economically reasonable for all municipalities. Indeed, the report contemplates case-by-case determinations as described in *Puget Soundkeeper*, 102 Wn. App. at 794-95. This aligns with Ecology's interpretation of its role in mandating AKART through the permitting process under RCW 90.48.520.

NWEA cites *Bellingham v. Dep't of Ecology*, No. 84-211, 1985 WL 21854 (Wash. Pollution Control Hr'gs Bd. June 19, 1985), to argue that the fee increases projected in the Tetra Tech report were reasonable. To the extent we consider decisions of the PCHB as persuasive, *Bellingham* works against NWEA.

In *Bellingham*, Ecology refused to concur to the city's application for a waiver from an effluent limitation requirement. *Bellingham* at *1. As PCHB explained, "[Ecology] wants Bellingham to upgrade its sewage treatment plant to secondary treatment. The City does not want to do it. At the heart of the dispute is the problem of cost." *Bellingham* at *1. An EPA cost projection determined implementing Ecology's plan would result in a user fee increase from $10.50 to $27.38 in 1985 dollars. *Bellingham* at *6-7. Ecology determined that this increase was reasonable under the circumstances and the PCHB agreed. *Bellingham* at *5, *15-16. But the PCHB reached this conclusion after reasoning that Ecology "provided for case-by-case evaluation of each municipal discharge to determine if the generalized determination is appropriate for that source at the time the question is asked." *Bellingham* at *15.

NWEA argues that because an increase to $27.38 in 1985 dollars ($65.44 in 2018 dollars) was reasonable in *Bellingham*, it follows that the $94.66 increase in fees projected in the Tetra Tech report is also reasonable, and that tertiary treatment is therefore AKART. But this ignores that the PCHB based its decision on Ecology providing a case-by-case evaluation of municipalities' discharges. Not only does the logic in *Bellingham* align with Ecology's interpretation of its statute mandating case-by-case analysis but the facts there were distinguishable: Ecology used its case-by-case analysis to require *stricter* effluent limits for the city—the opposite of the result NWEA warns against in its petition.

Finally, NWEA argues that this case is like *Rios v. Department of Labor and Industries*, 145 Wn.2d at 505. But *Rios* is distinguishable. There the Department of Labor and Industries declined to adopt a regulation for mandatory pesticide monitoring after previously recommending—but not mandating—the same testing in an earlier regulation. *Rios*, 145 Wn.2d

at 487-89. When promulgating the earlier regulation recommending the monitoring, the Department concluded the monitoring program was "necessary and doable." *Rios*, 145 Wn.2d at 508. Our Supreme Court concluded in that "extraordinary circumstance" the Department violated its duties under its controlling statute. *Rios*, 145 Wn.2d at 507-09.

There are no such extraordinary circumstances here. Although Ecology's Tetra Tech report stated that tertiary treatment is "available and economically reasonable," Tetra Tech equivocates and caveats this language throughout the report, noting that "[s]ignificant additional work is needed" before requiring such limits. Suppl. Admin. R. at 1447, 1467. Moreover, Ecology did not adopt the Tetra Tech report's conclusions in a regulation as the Department of Labor and Industries did in *Rios*. Thus, NWEA's argument fails.

C.    *Ecology's Compliance with the APA*

NWEA argues that Ecology's denial fails to comply with the APA because Ecology did not adequately state the reasons for the denial or state the alternative means by which it would address NWEA's concerns. NWEA also argues that Ecology's denial was arbitrary and capricious because it was taken without regard to the attending facts and circumstances. We disagree.

1. *Ecology Complied with APA Requirements under RCW 34.05.330 when it Denied NWEA's Petition.*

NWEA argues that Ecology failed to comply with the APA under RCW 34.05.330(1). We disagree.

RCW 34.05.330(1) provides:

Within sixty days after submission of a petition, the agency shall either (a) deny the petition in writing, stating (i) its reasons for the denial, specifically addressing

the concerns raised by the petitioner, and, where appropriate, (ii) the alternative means by which it will address the concerns raised by the petitioner, or (b) initiate rule-making proceedings.

The purpose of this provision is to require an agency give notice to the interested parties and enable a reviewing court to determine whether the agency's stated reasons for denying the petition were arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *Squaxin Island Tribe*, 177 Wn. App. at 741. We therefore evaluate Ecology's explanation under RCW 34.05.330(1) to determine whether Ecology fulfilled its purpose of facilitating judicial review. *Squaxin Island Tribe*, 177 Wn. App. at 741.

a. *Ecology Stated its Reasons for Denying the Petition.*

NWEA argues that Ecology failed to specifically address NWEA's concerns regarding reducing toxic pollutants. Ecology argues that its determination that NWEA's requested technology is not economically reasonable also applies to NWEA's request that toxic pollutants be reduced. We agree with Ecology.

NWEA's petition was based on Objective F from Ecology's own Tetra Tech report. Objective F was based on tertiary treatments. The Tetra Tech study also projected costs for implementing such technologies. A 2010 joint report from EPA and Ecology determined that tertiary treatment can reduce toxins in wastewater. It was therefore within Ecology's expertise to determine that tertiary treatment and toxin reduction were linked. Accordingly, when Ecology denied NWEA's petition for not being economically reasonable, Ecology responded to NWEA's concerns about both tertiary treatment and toxin reduction.

Ecology's response to NWEA stated that it was denying the petition because Ecology did not agree that defining AKART as tertiary treatment for all wastewater treatment plants by

regulation was economically reasonable. Ecology also explained that "[t]reatment technology must be both economically and technically feasible in order to be AKART." CP at 119. This response provided NWEA with sufficient notice as to why Ecology was rejecting its petition. This response also provides us with enough information determine whether Ecology's conclusion was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law because we can compare Ecology's determination against the record. Thus, Ecology adequately stated its reasons for denying the petition under RCW 34.05.330(1)(a)(i).

     b. *Ecology Stated Alternative Means by which it Will Address NWEA's Concerns.*

NWEA appears to argue that Ecology failed to state the alternative means by which it will address NWEA's concerns. NWEA admits that Ecology addressed alternative measures but argues that because the alternatives do not conform to AKART Ecology's response was inadequate. We disagree.

In its response, Ecology listed the alternative measures it was taking to apply AKART to its individual treatment plant permitting process:

> 1. Set nutrient loading limits at current levels from all permitted dischargers in Puget Sound and its key tributaries to prevent increases in loading that would continue to contribute to Puget Sound's impaired status.
> 2. Require permittees to initiate planning efforts to evaluate different effluent nutrient reduction targets.
> 3. For treatment plants that already use a nutrient removal process, require reissued discharge permits to reflect the treatment efficiency of the existing plant by implementing numeric effluent limits used as design parameters in facility specific engineering reports.

CP at 119. Ecology stated it decided on this approach because the complex relationships between discharger-specific nutrient limits and their impact locally and further afield required further study.

23

As explained in part B above, AKART specifically applies to Ecology's permitting process under RWC 90.48.520. Ecology's stated alternative measures are directly applicable to tertiary treatment, especially as it relates to nutrient reduction. Thus, assuming for the sake of argument that tertiary treatment is AKART, Ecology's alternatives responded directly to NWEA's concerns. Moreover, there is no requirement that an agency's stated alternatives align with the strict regulatory mandate a petition requested. Accordingly, Ecology appropriately listed alternatives under RCW 34.05.330(1)(a)(ii).

2. *Ecology's Denial of NWEA's Petition was not Arbitrary and Capricious.*

NWEA argues that Ecology's denial of its petition was arbitrary and capricious. Br. of Appellant at 43. It argues Ecology denied the petition because it preferred to abandon AKART determinations and take a water quality-based approach and because Ecology failed to consider the information supporting the petition. NWEA also argues that Ecology's decision not to adopt a rebuttable presumption that tertiary treatment should be mandatory for municipalities was arbitrary and capricious. We disagree.

When a petition for rulemaking is denied, we may grant relief only where the agency action is outside the statutory authority of the agency, arbitrary, or capricious. RCW 34.05.570(4)(c)(ii)-(iii); *Rios*, 145 Wn.2d at 491-92. An agency's action is arbitrary or capricious if it is taken without reason and without regard to the attending facts and circumstances. *Squaxin Island Tribe*, 177 Wn. App. at 742. "[N]either the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious." *Rios*, 145 Wn.2d at 504.

a. *Ecology Did not State That it Was Abandoning AKART Requirements.*

NWEA argues that Ecology has demonstrated that it is not acting in compliance with the statutory mandate to apply AKART. NWEA argues that because Ecology's denial stated it was taking a water quality-based approach rather than apply AKART broadly for Puget Sound, it was choosing not to apply AKART to wastewater dischargers. But Ecology determined that defining tertiary treatment as AKART and applying that to the whole of Puget Sound was not economically reasonable, not that it was abandoning AKART for a water quality-based approach.

Ecology's denial stated that "enhanced treatment for nutrient removal is neither affordable nor necessary for all wastewater treatment plants." CP at 119. Ecology explained it was undertaking a study with the EPA to determine a water quality-based approach to reducing effluent limits. Nowhere did Ecology state that it would not apply AKART when issuing permits to wastewater dischargers. Reading the whole of Ecology's denial, we conclude that Ecology determined that a water quality-based metric was better for measuring overall waterway health in the whole of Puget Sound, not that Ecology intends to replace AKART standards in individual permitting decisions with a water quality metric. Thus, Ecology's denial was not arbitrary, capricious, or contrary to law for suggesting a water quality-based approach was more appropriate for measuring the Puget Sound water quality impairments.

b. *Ecology Properly Considered NWEA's Petition.*

NWEA argues that Ecology did not review the documents NWEA submitted with its petition before denying the petition. We disagree.

An agency's failure to consider information supporting a proposed regulation may be arbitrary and capricious. *Nw. Sportfishing Indus. Ass'n v. Dep't of Ecology*, 172 Wn. App. 72, 89-90, 288 P.3d 677 (2012). The agency record "shall consist of any agency documents expressing the agency action, other documents identified by the agency as having been considered by it before its action and used as a basis for its action." RCW 34.05.566(1). However, the superior court may admit evidence in addition to the agency record that relates to or explains the agency's decision-making process. RCW 34.05.562; *Aviation West Corp. v. Dep't of Labor & Indus.*, 138 Wn.2d 413, 419, 980 P.2d 701 (1999).

Ecology filed an agency record with the court that included more than 30 documents spanning more than 1500 pages. The record included NWEA's petition, Ecology's denial letter, the Tetra Tech report, and various other technical documents relating to water quality, algae growth, toxicity, and nutrient removal. Crucially, the Tetra Tech report relates directly to NWEA's petition, describing both the standards on which NWEA based the petition (Objective F) and the projected costs of implementing the plan. AR at 160-68, 214-17. Indeed, Ecology's denial of the petition was based on its determination that mandating NWEA's request would not be economically reasonable. This decision is supported by the Tetra Tech report, which Ecology included in the agency record. The extent of this record is enough to show that Ecology took a reasoned approach to its analysis.

NWEA submitted exhibits with its petition totaling more than 25,000 pages. These were not included in Ecology's record. NWEA filed a motion in the superior court to admit these voluminous exhibits. Ecology did not oppose the motion and the superior court admitted the additional documents. NWEA argues that because Ecology left thousands of pages that it

included in its petition out of the agency record presented to the superior court, Ecology necessarily "admits that it ignored thousands of pages of information supporting NWEA's request for rulemaking." Br. of Appellant at 49. But beyond asking us to draw inferences from what Ecology left out of the agency record, NWEA makes no showing that Ecology ignored any of the documents NWEA submitted. Even if Ecology relied only on the shorter record it compiled, the documents therein support Ecology's decision and show that Ecology's action was not taken without reason and without regard to the attending facts and circumstances. Thus, Ecology's determination was not arbitrary and capricious.

c. *Ecology's Decision not to Adopt NWEA's "Rebuttable Presumption" to Mandate Tertiary Treatment was Not Arbitrary and Capricious.*

NWEA argues that Ecology failed to respond to NWEA's request that Ecology mandate a "rebuttable presumption" that treatment plants use tertiary treatment. Br. of Appellant at 40. NWEA argues that if tertiary treatment meets the AKART standard, then Ecology's determination to not adopt the rebuttable presumption was arbitrary and capricious because Ecology did not find tertiary treatment and a rebuttable presumption "necessary." Br. of Appellant at 40. Ecology argues that it was not arbitrary and capricious to decline to adopt the rebuttable presumption because a mandate requiring such a presumption is not necessary in treatment plants where tertiary treatment is not economically reasonable. We agree with Ecology.

Although Ecology stated that "enhanced treatment for nutrient removal is neither affordable nor necessary for *all* wastewater treatment plants," it explained this in the context of describing an EPA nationwide study of such plants. CP at 119 (emphasis added). Moreover,

Ecology stated in its denial letter that it was denying NWEA's petition because a water-quality based approach was necessary and that tertiary treatment is not economically and technically feasible for all municipalities, not that a presumption to mandate tertiary treatment was unnecessary. Because Ecology concluded that defining AKART as tertiary treatment was not economically reasonable, it necessarily would not adopt a rebuttable presumption that tertiary treatment was mandatory. Thus, because Ecology's decision that defining AKART as tertiary treatment was not economically reasonable was not arbitrary and capricious, it follows that its decision to not to adopt a rebuttable presumption mandating such treatment was not either. Accordingly, Ecology's approach was reasoned and taken in regard to the attending facts.

## ATTORNEY FEES

NWEA argues that we should award it fees and costs under RCW 4.84.350. We disagree.

RCW 4.84.350(1) provides that "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." Here, NWEA does not prevail and is therefore not entitled to fees.

## CONCLUSION

We defer to Ecology's determination that defining tertiary treatment as AKART for all municipalities is economically unreasonable. Although Ecology is required to comply with AKART when issuing discharge permits, which may result in Ecology mandating tertiary treatment, the controlling statutes do not mandate that Ecology adopt such standards by rule. We hold that Ecology's denial letter complied with the APA because it stated its reasons for denying

No. 54810-1-II

NWEA's petition and stated the alternative means by which it will address NWEA's concerns. We also hold that Ecology's denial was not arbitrary and capricious. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Lee, C.J

_____
Sutton, J.